UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Dontaro L. Riddley, | Civil No. 10-4160 (PAM/JJG) |
| Petitioner, | |
| v. | REPORT AND RECOMMENDATION |
| Jessica Sims, Warden, | |
| Respondent. | |

JEANNE J. GRAHAM, United States Magistrate Judge

This case is before the undersigned on Petitioner Dontaro L. Riddley's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that the petition be denied and judgment be entered.

**I.   BACKGROUND**

Riddley is presently incarcerated at the Minnesota Correctional Facility (MCF) in Stillwater, Minnesota. He is serving concurrent life sentences for first-degree premeditated murder and first-degree murder involving the commission of an aggravated robbery. Riddley was convicted of the charges by a jury on March 11, 2008, and sentenced on March 19, 2008. He appealed directly to the Minnesota Supreme Court, which affirmed the conviction and sentence in *State v. Riddley*, 776 N.W.2d 419 (Minn. 2009). Riddley filed the instant petition for habeas relief on October 6, 2010, asserting the trial court erred by admitting evidence of a prior robbery and dismissing a veniremember for cause.

### A.     The Trial

During jury selection, a veniremember identified as J.S. indicated on her juror questionnaire that a Minneapolis police officer shot and killed her brother fifteen years before. J.S. also told a court clerk that one of the prosecutors on Riddley's case had prosecuted her son in juvenile court. On subsequent examination, J.S. said she was not happy with how her son's case was handled, and she described her interactions with the prosecutor as heated and emotional. One of the main points of contention was where her son would be incarcerated: at MCF-Red Wing, as the prosecutor argued, or at Elmore Academy, as J.S. requested. Her son was placed at MCF-Red Wing. J.S. also believed her son's cooperation with the prosecutor had lengthened his detention, and in fact, he was still in detention at the time of Riddley's trial. J.S. acknowledged that her son's status as an extended jurisdiction juvenile meant the prosecutor might have further dealings with her son. Nevertheless, J.S. said that the circumstances of her brother's death and her interactions with the prosecutor would not affect her impartiality and that she could find Riddley guilty if the State proved its case beyond a reasonable doubt.

The State moved to dismiss J.S. for cause, arguing that J.S. and the prosecutor had developed an adversarial relationship during the juvenile proceedings. Riddley objected and argued that the dismissal would have a disparate racial impact. Both J.S. and Riddley are African-American. Riddley also pointed out that J.S. said she could be fair and decide the case solely on the evidence. Riddley further suggested that J.S. might actually be biased in favor of the State in order to gain future advantage from the prosecutor in her son's case. The trial court found cause to dismiss J.S. based on both her brother's death and her contentious interactions with the prosecutor.

The State presented the following evidence at Riddley's trial. On the night of April 17, 2007, Deonsae Guilmant and his girlfriend, Mattea Thurman, met Riddley at a convenience store near Thurman's home. Thurman was carrying a gun, which she handed to Riddley as they walked away from the store. The threesome soon encountered Robert Schluter walking in the alley behind Waldo's, a neighborhood bar. Schluter testified at trial that one of the men, who was wearing a black hooded sweatshirt, sprinted toward him, pointed a gun in his face, forced him to his knees, and cocked the gun. The other man and the woman removed Schluter's shoes and took his wallet from his pocket. Thurman testified that Riddley was the man in the hooded sweatshirt with the gun and that she and Guilmant were the other two people involved in the robbery. Schluter ran to a friend's house and called 911. He told the dispatcher he had been robbed by a black woman and two black men, one of whom had a gun and was wearing a black hooded sweatshirt.

Riddley, Guilmant, and Thurman continued to walk around the neighborhood. At one point, Riddley separated from the others and returned several minutes later with a pair of pants and two pairs of shoes, which he gave to Thurman. The trio then crossed another alley and saw two men, later identified as Richard Christianson and Michael Trinity, walking toward them. Riddley said he was going to rob them, and Thurman walked away. Thurman heard two gunshots, and when she looked back, she saw Riddley kicking something. Thurman walked to the nearby home of two friends, Courtney Adams and Erin McAdoo. Schluter and his friend, James Senkiw, also heard the gunshots. Senkiw called 911, and while he was on the phone, he saw two black males run through his yard. One of the men was wearing a black hooded sweatshirt.

Shortly thereafter, Guilmant arrived at Adams and McAdoo's house and told Thurman, "Riddley shot him." Riddley also showed up and told Thurman the shooting was an accident. Riddley, Thurman, and Guilmant threw a pair of pants, two pairs of shoes, and Guilmant's jacket in the trash bins behind the house. Thurman and Guilmant decided to go home and as they walked through the alley, they found Christianson's and Trinity's bodies, and Thurman called 911. Meanwhile, Riddley told McAdoo and Adams that he had killed two people in the alley near Thurman's house. Riddley said he accidentally shot one of the men because he thought the man flashed a badge and the other man because he did not want to leave a witness.

The police arrived at the murder scene, and Thurman and Guilmant were taken to the station for questioning. Although they initially denied knowing anything about the shootings, Thurman later admitted that the gunman was Riddley. The police arrested Riddley at his residence and found a gun under his mattress. Riddley told the police about the items thrown in the trash, and the police recovered several items, including Trinity's driver's license. McAdoo and Adams told the police what Riddley said at their house after the shootings.

B.     **The Appeal**

Riddley made two arguments to the Minnesota Supreme Court: (1) that the trial improperly admitted evidence of the Schluter robbery and the shoes Riddley gave to Thurman, and (2) that the trial court improperly dismissed J.S. for cause. The Minnesota Supreme Court agreed with Riddley that the trial court abused its discretion by admitting evidence of the robbery and shoes, but concluded that Riddley did not suffer any prejudice as a result. *Riddley*, 776 N.W.2d at 427-28. The court affirmed the dismissal of J.S. because of her prior antagonistic

relationship with the prosecutor. *Id.* at 428. Riddley's argument that J.S. might favor the prosecution to benefit her son's case provided an additional cause for dismissal. *Id.* at 430.

## II.    DISCUSSION

As stated by the United States Supreme Court in *Preiser v. Rodriguez*, "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." 411 U.S. 475, 484 (1973). On review of a § 2254 habeas petition, a court must determine whether the incarceration of a state prisoner violates the United States Constitution or federal law. 28 U.S.C. § 2254(a).

A federal court's review of the state court decisions underlying a state prisoner's habeas petition is "limited and deferential." *Lomholt v. Iowa*, 327 F.3d 748, 751 (8th Cir. 2003). There are only three circumstances in which a federal court may grant a state prisoner's habeas petition: (1) if a state court decision was contrary to clearly established federal law, (2) if a state court decision involved an unreasonable application of clearly established federal law, or (3) if the state court decision was based on an unreasonable evaluation of the facts. *See* 28 U.S.C. § 2254(d).

Regarding the first circumstance, a state court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The second circumstance is triggered when the state court correctly identifies the governing Supreme Court precedent but unreasonably applies it to the facts at hand or when the state court unreasonably extends or refuses to extend the Court's precedent to a new context. *Id.* at 407. To warrant

habeas relief in this circumstance, the state court's misapplication of the law must be "objectively unreasonable." *Id.* at 409. The final circumstance is controlled by § 2254's mandate that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### A. Evidence of the Schluter Robbery and the Shoes

On appeal, Riddley argued that the trial court erred by admitting evidence of the Schluter robbery and the shoes he gave to Thurman, on the grounds that the evidence significantly affected the verdict and deprived him of the due process right to a fair trial. The Minnesota Supreme Court agreed that the trial court abused its discretion in admitting the evidence, but found that the error did not prejudice Riddley.

"Before seeking habeas corpus relief under § 2254, a prisoner ordinarily must 'fairly present' his federal claims to the state courts." *Turnage v. Fabian*, 606 F.3d 933, 936 (8th Cir. 2010). The purpose of this requirement is to give state courts the first opportunity to correct errors alleged by state prisoners. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). To satisfy the fair presentation requirement, the prisoner must present the federal nature of his claim to each level of the state courts. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). The prisoner must do more than outline the underlying facts or "make a general appeal to a constitutional guarantee as broad as due process." *Turnage*, 606 F.3d at 936 (quotations omitted). The prisoner must, at minimum, "explicitly refer[] the state courts to the United States Constitution or federal case law." *Wyldes v. Hundley*, 69 F.3d 247, 251 (8th Cir. 1995) (citations omitted). If a state prisoner does not fairly present a federal claim to the state courts, and the claim could no longer be

reviewed because of a state procedural rule, the claim is procedurally defaulted. *Turnage*, 606 F.3d at 936.

Assuming without deciding that Riddley's first ground for habeas relief implicates clearly established federal law, Riddley's claim fails because he did not present the federal nature of the claim to the Minnesota Supreme Court. The only reference to federal law in Riddley's appellate brief was a passage in a concurring opinion in *Krulewitch v. United States*: "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." 336 U.S. 440, 453 (1949) (Jackson, J., concurring in judgment and opinion). Not only is this statement inconsistent with recent Supreme Court jurisprudence, *see CSX Transportation, Inc. v. Hensley*, 129 S. Ct. 2139, 2141 (2009), but a jury's adherence to instructions is not at issue here.

Other than the obscure reference to *Krulewitch*, Riddley relied strictly on state law in advancing his due process claim. To satisfy the requirement of fair presentation, however, a petitioner must apprise the state court that an evidentiary ruling "was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment." *Duncan v. Henry*, 513 U.S. 364, 366 (1995). Because Riddley did not apprise the Minnesota Supreme Court of the federal nature of his due process claim, it was not fairly presented.

The Court must now determine whether a state procedural rule would bar Riddley from bringing his federal constitutional claim before a state court. Under Minnesota law, once an individual has filed a direct appeal, "all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief." *State v. Knaffla*, 243 N.W.2d 737, 741 (1976). There is no basis to conclude that Riddley's federal due

process claim was not known when he filed his direct appeal, and the Court concludes he would be barred from raising it in state court at this time.

The Court may not review Riddley's procedurally defaulted claim unless he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (*quoted in Turnage*, 606 F.3d at 941). Riddley does not attempt to show why he did not present his federal claim to the state courts, nor has he claimed he is actually innocent. *See Schlup v. Delo*, 513 U.S. 298, 316 (1995). The Court is therefore barred from reviewing his first habeas claim.

### B. Dismissal of the Veniremember for Cause

Riddley contends that the trial court erred when it dismissed J.S. for cause, because she said she could be fair and decide the case on the evidence. He alerted the Minnesota Supreme Court to the federal nature of this claim by referring to the United States Constitution and several Supreme Court cases. Consequently, this claim is properly exhausted.

The question of a veniremember's partiality is a question of fact: "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). A habeas court must apply § 2254's presumption of correctness to a trial court's determinations of a prospective juror's credibility and demeanor, giving "special deference" to the trial court. *Id.* at 1038. The question, therefore, for this Court "is whether there is fair support in the record" for the trial court's decision that J.S. could not be impartial. *See id.* The Court is mindful that it is not unusual for a veniremember to make ambiguous or contradictory statements

during voir dire. *Id.* at 1039. The experience and education of prospective jurors varies widely, and many individuals are not accustomed to answering the strategic and leading questions asked by lawyers. *Id.* The trial judge has the discretion "to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading." *Id.*

During voir dire, J.S. said she could be impartial and assess the case solely on the evidence, but she made those statements in response to leading questions from Riddley's attorney. J.S. also made other comments indicating she could not be impartial. She admitted she had been unhappy with the prosecutor during her son's case, and she attributed her son's extended detention to his cooperation with the prosecutor. Moreover, Riddley's argument that J.S.'s history with the prosecutor would favor the State actually worked against him. As the Minnesota Supreme Court remarked,

> Regardless of whether J.S.'s relationship with the prosecuting attorney would have been helpful or hurtful to the State, the key concern is that J.S.'s experiences may have affected her decision on the merits of Riddley's case. A relationship that would cause J.S. to decide Riddley's case based on a consideration other than evidence introduced at trial-certainly including hopes that a decision favorable to the State would entice the prosecuting attorney to be lenient on her son-provides cause for dismissal.

*Riddley*, 776 N.W.2d at 430. This Court concludes there is fair support in the record for the trial court's dismissal of J.S. for cause, and Riddley has not rebutted the presumption of correctness with clear and convincing evidence.

On appeal, Riddley also argued that *Batson v. Kentucky*, 476 U.S. 79 (1986), should apply to challenges for cause. *Batson* held that using a peremptory challenge to exclude a prospective juror of the same race as the defendant for a racially discriminatory reason violates equal protection. *Id.* at 86. However, "*Batson* applies only to peremptory strikes. We know of no

case that has extrapolated the *Batson* framework to for-cause strikes." *United States v. Elliott*, 89 F.3d 1360, 1364-65 (8th Cir. 1996). Accordingly, because J.S. was struck for cause, *Batson* does not apply.

### III. RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that the Petition for Writ of Habeas Corpus (Doc. No. 1) be **DENIED** and **JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: February 28, 2011

*s/ Jeanne J. Graham*
JEANNE J. GRAHAM
United States Magistrate Judge

### NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **March 15, 2011**. A party may respond to the objections within ten days after service thereof. Any objections or responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made. The party making the objections must timely order and file the transcript of any hearing unless the parties stipulate that the district judge is not required to review a transcript or if the district judge directs otherwise.